IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
5:19-cv-79

**TECHNIBILT, LTD., and**
**TECHNIBILT GROUP INSURANCE**
**PLAN aka TECHNIBILT LTD.**
**GROUP HEALTH PLAN,**

      Plaintiffs,

   vs.

**BLUE CROSS AND BLUE SHIELD**
**OF NORTH CAROLINA**,

      Defendant.

_____

## COMPLAINT

<u>PARTIES</u>

1.     Plaintiff Technibilt, Ltd. ("Technibilt") is a corporation organized and existing under the laws of the State of North Carolina with its principal office and place of business in Newton, Catawba County, North Carolina.

2.     Plaintiff Technibilt Group Insurance Plan aka Technibilt Ltd. Group Health Plan ("the Plan") is a self-funded "employee welfare benefit plan" organized and existing pursuant to 29 U.S.C. § 1002(1).

3.     The Plan is subject to suing as a separate entity pursuant to 29 U.S.C. § 1132(d)(1).

4.     Technibilt is the Plan Sponsor, Plan Administrator, and a fiduciary of the Plan.

5.     Defendant Blue Cross Blue Shield of North Carolina is a corporation organized and existing under the laws of the State of North Carolina, is headquartered in North Carolina, and does substantial business in the Western District of North Carolina.

6. Defendant serves as the Plan's claims administrator and fiduciary in handling benefit claim processing, determinations, notifications, payment, and managing Plan assets.

<u>JURISDICTION AND VENUE</u>

7. This Court has jurisdiction to hear Plaintiffs' claims pursuant to 28 U.S.C. § 1331, in that the claims arise under the laws of the United States. Specifically, Plaintiffs bring this action to enforce their rights under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq*. ("ERISA"), as allowed by 29 U.S.C. § 1132. This Court has exclusive jurisdiction, as all Parties are fiduciaries and Plaintiffs are asserting causes of action against Defendant under the civil enforcement provisions of ERISA.

8. Venue in the Western District of North Carolina is appropriate by virtue of Plaintiffs' presence in this district and Defendant doing substantial business in this district.

<u>FACTUAL ALLEGATIONS</u>

A. <u>The Parties</u>

9. Technibilt is a North America's leading manufacturer of shopping carts and has been in business for over seventy years.

10. Technibilt established and maintains the Plan, which is fully-funded through employer and employee contributions, in order to provide group health benefits for its eligible employees and their dependents.

11. Defendant provides health insurance, various insurance-related products, and third-party administrative and claim processing services to companies offering self-funded or partially self-funded group benefit plans.

12. Defendant is an independent licensee of the Blue Cross and Blue Shield Association ("BCBSA"), an association of independent Blue Cross and Blue Shield plans

throughout the United States that provides access for Blue Cross and Blue Shield plan members to other participating Blue Cross and Blue Shield plans' networks of providers that are outside of their particular plans' service area ("BlueCard Program").

B. <u>The Relationship between the Parties</u>

13. Technibilt maintains the Plan and determines participant eligibility in the Plan.

14. Technibilt selected and hired Defendant to provide certain third-party administrative services for the Plan, including but not limited to handling and processing claims, making benefit determinations, paying claims, recordkeeping, issuing benefit determination notifications, and managing, controlling, and disposing of Plan assets.

15. Plaintiffs have and maintain control over the Plan, including but not limited to retaining the authority to remove Defendant as the Plan's third-party administrator.

16. Plaintiffs and Defendant ("the Parties") entered into an Administrative Services Agreement ("ASA") on or about January 1, 2010, which is amended annually.

17. The ASA is one of the core, fundamental documents governing the operational aspects of the Plan.

18. In the ASA, the Parties contracted for the Plan to delegate the responsibility for certain components of administering and servicing the Plan to Defendant, including but not limited to Defendant performing third-party discretionary administrative services including all claim processing, benefit determinations, payment of claims, recordkeeping, benefit determination notifications, and the management, control, and disposal of Plan assets.

19. The ASA requires that Plaintiffs provide funding of Plan assets into Defendant's general claims account, which is controlled and managed by Defendant, in exchange for the provision of various administrative and claims processing services (the "Security Amount").

20.     Technibilt is entrusted with employee funds for remittance to Defendant along with employer contributions to fully fund the Plan.

21.     Plaintiffs funded and periodically replenished the Security Amount.

22.     From the Plan assets contained in the Security Amount, Defendant is authorized to make payments for claims, expenses, and services rendered by health care providers, as well as to pay itself assessed administrative fees and other fees and expenses, as determined by Defendant and at Defendant's discretion.

23.     Defendant exercised control over the management and disposal of Plan assets.

24.     The ASA requires Plaintiffs to pay Defendant inter-plan access fees and network performance fees in order to provide access to Plan members to other participating entities of the BCBSA network and to participate in the BlueCard Program.

25.     The ASA also requires Defendant to produce certain reports to Plaintiffs, including but not limited to monthly statement of fund balance and funding required, monthly summary of billed charges by product, membership and charges, detail of paid claims, participants with claims in excess of designated amount, monthly claims paid, triangulation, utilization, and the like.

26.     Defendant is compensated for providing these administrative services to the Plan.

C.  The Existence and Scope of Defendant's Fiduciary Duties

27.     Defendant must meet the minimal standards required by ERISA to be considered a fiduciary of the Plan.

28.     Pursuant to 29 U.S.C. § 1002(21)(A):

> [A] person is a fiduciary with respect to the plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of assets, (ii) he

renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29.     An individual may be a fiduciary for ERISA purposes either because the Plan documents explicitly describe fiduciary responsibilities (a named fiduciary) or because that person functions as a fiduciary (a functional fiduciary). Here, Defendant meets either criteria.

30.     Defendant served as a named fiduciary, as Section 7.3 of the ASA entitled "Fiduciary Status," provides that:

> <u>Internal Review Process</u>:  In processing claims [Defendant] shall be responsible for making the decision to allow or deny all initial claims for benefits that are filed by Members and for notifying each Member of the decision regarding the claim, consistent with the terms of the Agreement and Section 503 of ERISA. [Defendant] shall also be responsible for making the decision to allow or deny all appeals of denied claims for benefits and for notifying each Member of the decision regarding the appeal, consistent with the terms of this Agreement and Section 503 of ERISA. In making the decisions described in this paragraph, [Defendant] shall have discretionary authority to construe and interpret the terms of the Group Health Plan and to determine whether a claim is properly payable under the Group Health Plan.

31.     Defendant functioned as the Plan's fiduciary in processing claims, making benefit determinations, paying claims, recordkeeping, issuing benefit determination notifications, and managing, controlling, and disposing of Plan assets.

32.     Defendant exercised discretionary control or discretionary authority over processing claims, making benefit determinations, paying claims, recordkeeping, issuing benefit determination notifications, and managing, controlling, and disposing of Plan assets.

33.     Defendant has fiduciary, contractual, and statutory duties to Plaintiffs to discharge its expressly delegated fiduciary duties in accordance with ERISA, its promulgating regulations,

and the documents and instruments governing the plan, including but not limited to the Plan, the ASA, and all amendments thereto.

D. The ASA's Requirements

34. Section 7.3 of the ASA, as amended in 2014, provides that Defendant "shall be responsible for making the decision to allow or deny all initial claims for benefits that are filed by Members and for notifying each Member of the decision regarding the claim, consistent with the terms of this Agreement and Section 503 of ERISA."

35. Section 7.4 of the ASA provides that Defendant "may apply its standard practices, policies and procedures used in its insured business where no contrary instructions, agreements or Group Health Plan provisions exist, and Plan Sponsor and Plan Administrator expressly authorize [Defendant] to employ such standard practices, policies and procedures."

36. Section 9.4 of the ASA requires that Defendant "provide Plan Sponsor or Plan Administrator a Standing of Account within 20 days after the end of each calendar month."

37. Section 12.1 of the ASA provides that Defendant "shall indemnify and hold harmless Plan Sponsor, its directors, officers, employees (acting in the course of their employment, but not as Members) and agents for that portion of any loss, liability, damage, expense, settlement, cost or obligation (including reasonable attorneys' fees) which was caused solely and directly by [Defendant's] willful misconduct, criminal conduct, gross negligence, fraud or breach of fiduciary responsibility."

38. Section 18.13 of the ASA provides that "no person, entity or organization other than [Defendant] shall be held accountable or liable to Plan Sponsor, Plan Administrator or the Group Health Plan for any of [Defendant's] obligations to Plan Sponsor, Plan Administrator and the Group Health Plan created under this Agreement."

39.     Exhibit E to the ASA, as amended in 2016, provides that "[w]hen Members receive covered healthcare services within the geographic area served by a Host Blue, [Defendant] will remain responsible to the Plan Sponsor, Plan Administrator, and/or Group Health Plan for fulfilling [Defendant's] contract obligations."

E.  The Guardian Stop Loss Policy

40.     During all relevant times alleged herein, Technibilt reinsured the Plan by purchasing annual Excess Stop Loss Insurance ("stop loss policy") through The Guardian Life Insurance Company of America ("Guardian"), which coverage was in full force and effect on an annual calendar year basis from January 1, 2016 through December 31, 2018.

41.     In 2018, the stop loss policy contained a $90,000 individual stop loss minimum deductible and an unlimited individual stop loss reimbursement maximum.

42.     The stop loss policy provided coverage based upon the date the claim was actually paid, not the date the claim was actually incurred, nor the date the claim was made.

43.     Under the 2018 stop loss policy, all claims must have been paid between January 1, 2018 and December 31, 2018 in order to be eligible for reimbursement by Guardian.

F.  The Plan's High Claimant

44.     Beginning in 2017, the dependent of a covered participant under the Plan became gravely ill with Leukemia and became the Plan's "high claimant" for 2017.

45.     In 2018, the same participant again became the Plan's "high claimant," going over the individual stop loss minimum deductible amount by March, thereby implicating the Guardian stop loss coverage for 2018 as of that date.

46.     The Plan's high claimant was medically air-lifted from Charlotte, North Carolina to a hospital in Seattle, Washington in September 2018 for medical treatment.

47.     The Plan's high claimant was admitted on an inpatient basis at Seattle Children's Hospital from September 13, 2018 until November 7, 2018.

48.     The Plan's high claimant's medical care in Seattle fell within the geographic network of Regence Blue Cross ("the Host Blue"), which is also a member of the BCBSA.

49.     On November 7, 2018, the Plan's high claimant was medically air-lifted from Seattle, Washington back to Charlotte, North Carolina, where he died on November 10, 2018.

G.    Blue Cross NC's High Claimant Claim Processing

50.     Shortly after the high claimant's death on November 10, 2018, Plaintiffs commenced discussions with Defendant regarding the high claimant's outstanding claims.

51.     On or about December 5, 2018, Plaintiffs requested a year-to-date detailed claims report for the high claimant from Defendant.

52.     On or about December 6, 2018, Dustin Deal, an independent benefits consultant acting on behalf of Plaintiffs, contacted Meredith Hunter, Plaintiffs' Client Account Manager at Defendant, regarding Plaintiffs' concerns regarding any outstanding claim processing for the high claimant.

53.     Also on or about December 6, 2018:

a.      Dustin Deal informed Meredith Hunter of the "need to get those claims [related to the high claimant] processed ASAP for dates of service up through November [2018];"

b.      Dustin Deal requested that Meredith Hunter reach out to the medical providers in Seattle to determine what other claims were pending;

c.      Meredith Hunter informed Dustin Deal that she was "reaching out to claims right now. I want to get a better idea of how much we can control;"

d.      Meredith Hunter informed Dustin Deal that she could not reach out to the individual medical providers; and

e.      Meredith Hunter informed Dustin Deal that "as far as claims that are already in house we can ask that they expedite."

54.      The Parties continued to exchange emails and telephone calls over the next several weeks regarding any outstanding claims of the high claimant.

55.      On or about December 10, 2018, Meredith Hunter informed Dustin Deal that the delay in processing the Seattle-area medical claims for the high claimant could be in part due to the BlueCard System.

56.      On December 17, 2018, several representatives from Plaintiffs and at least seven representatives from Defendant held a teleconference to discuss an outstanding air ambulance claim, as well as any and all other outstanding Seattle-area medical claims of the high claimant.

57.      During the December 17, 2018 teleconference and/or in subsequent written and/or communications between the Parties:

a.      Plaintiffs' representatives made it clear to Defendant that Defendant would need to process and pay all outstanding claims related to the high claimant by the end of the year because of the stop loss policy, including, specifically, all Seattle-area medical provider claims;

b.      Plaintiffs instructed Defendant to process and pay all outstanding claims related to the high claimant by the end of the year, including, specifically, all Seattle-area medical provider claims;

c.      Plaintiffs instructed Defendant to reach out to the Host Blue to determine if there were any pending claims related to the high claimant;

       d.      Plaintiffs instructed Defendant to reach out to the Host Blue to look into the Blue Cross Blue Shield computer system to see what other claims related to the high claimant had been submitted;

       e.      Meredith Hunter acknowledged and agreed to Plaintiffs' request to process and pay all outstanding claims related to the high claimant by the end of the year, including, specifically, all Seattle-area medical provider claims; and

       f.      Meredith Hunter agreed to reach out to the Host Blue to determine if there were any pending claims related to the high claimant.

58.     At all relevant times alleged herein, Defendant was aware of the existence of the stop loss policy, as well as the December 31, 2018 deadline for payment of claims for coverage under the stop loss policy.

59.     Defendant even charged Plaintiffs an annual fee in order for it to interface with Plaintiffs' stop loss vendor.

60.     The Host Blue received a claim in the amount of $824,301.39 on or about November 5, 2018 for the first month of the high claimant's hospitalization (September 13, 2018 to October 12, 2018) at the Seattle Children's Hospital ("the first claim").

61.     Defendant processed and paid the first claim in the amount of $824,301.39 on or about December 21, 2018.

62.     At all times during 2018, it was Plaintiffs' understanding that the $824,301.39 payment on December 21, 2018 was for the high claimant's entire Seattle hospitalization.

63.     At no point prior to January 11, 2019 did Defendant provide Plaintiffs with any indication that the $824,301.39 payment on December 21, 2018 was not for the high claimant's entire Seattle hospitalization, or that there remained any pending claims.

64.     The Host Blue received an additional claim in the amount of $810,470.81 on or about November 21, 2018 for the remainder of the high claimant's hospitalization (October 13, 2018 to November 7, 2018) at the Seattle Children's Hospital ("the second claim").

65.     At no point in 2018 did Defendant make Plaintiffs aware that a second claim had been submitted either to the Host Blue or to Defendant.

66.     Defendant processed and paid the second claim in the amount of $810,470.81 on or about January 11, 2019.

67.     At least 51 days passed between the receipt of the second claim by the Host Blue and the processing and payment of the second claim by Defendant.

68.     No extensions of time were ever requested or taken by the Host Blue or Defendant for the processing of the second claim.

69.     No notification was provided to the claimant or Plaintiffs of the benefit determination reached with respect to the second claim prior to January 11, 2019.

70.     Plaintiffs first became aware of the existence of the second claim only after the $810,470.81 payment was made by Defendant on January 11, 2019.

H.  Post-Second Claim Payment Communications

71.     On January 15, 2019, Plaintiffs were informed by Defendant in writing that it received the second claim from the Host Blue on December 13, 2018.

72.     On January 16, 2019, Plaintiffs were informed by Defendant in writing that it had been mistaken about the date it received the second claim from the Host Blue, and that it had, in fact, received the second claim from the Host Blue on December 31, 2018, not on December 13, 2018, as previously claimed by Defendant.

73.     Also on January 16, 2019, Plaintiffs were informed by Defendant that the second

claim was sent to Defendant by the Host Blue on December 27, 2018, but that Defendant did not receive the second claim until December 31, 2018.

74. On February 4, 2019, Plaintiffs' representatives received an email from Meredith Hunter advising them that she would no longer be the Client Account Manager for Plaintiffs, effective immediately.

75. On February 26, 2019, Defendant informed Plaintiff that:

> [Defendant's] standard practice, policy and procedure is to process claims within 30 days of the date [Defendant] receives the claim, because thirty days is the timeframe required by the North Carolina prompt payment statute. While the North Carolina statutory claim processing timeframe does not apply to claims processed for employer self-funded plans such as the Technibilt plan, [Defendant] still generally processes claims within 30 days of the receipt date and did so in this case, processing the subject claim within 11 days after it was received.

I. Result of Defendant's Late Payment of the Second Claim

76. If the second claim had been processed and paid by Defendant on or before December 31, 2018, as instructed and agreed, it would have been covered in full under the stop loss policy and would have been eligible for full reimbursement by Guardian.

77. Because the second claim that was received by the Host Blue on November 21, 2018 was not processed and paid by Defendant until January 11, 2019, it is not covered under the stop loss policy and is therefore ineligible for reimbursement by Guardian.

78. Plaintiffs relied to their detriment on Defendant's express and implied, written and oral, representations, promises, and agreements.

79. Defendant's conduct, actions, or inaction have caused harm to the Plaintiffs in that, as a result, the Plan has fewer assets available to pay benefits than it would have had but for the commission of the breach of fiduciary duty by Defendant.

80.     As a direct and proximate result of Defendant's conduct, actions, or inaction, Plaintiffs have incurred the full cost of the second claim in the amount of at least $810,470.81.

J.   Exhaustion of Administrative Remedies and the ASA's Meet and Confer Provision

81.     Plaintiffs have no legal obligation under ERISA or otherwise to exhaust administrative remedies for the breach of fiduciary duty claims raised in this Complaint under existing applicable law, and their claims are therefore ripe for judicial review.

82.     To the extent Plaintiffs have any obligation to exhaust administrative remedies, Plaintiffs allege they have fully exhausted their administrative remedies and their claims are ripe for judicial review pursuant to 29 U.S.C. § 1132.

83.     The ASA contains a provision that the Parties agree to meet and confer to resolve any disputes between the Parties and, that failing, to refer the dispute to nonbinding mediation.

84.     The Parties exchanged numerous written position statements with respect to this dispute between January and April, 2019.

85.     Thereafter, the Parties formally met and conferred in good faith on April 26, 2019 and, failing to reach a resolution to this dispute, agreed in writing that given the extensive communications between the Parties, nonbinding mediation under the ASA would not be fruitful and should therefore be waived.

86.     Plaintiffs have fully satisfied any and all prelitigation requirements under the ASA or otherwise, and their claims are therefore ripe for judicial review.


**FIRST CLAIM FOR RELIEF:**
**BREACH OF FIDUCIARY DUTY**
**UNDER ERISA 502(a)(2), 29 U.S.C. § 1132(a)(2)**

87.     Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as if set forth fully herein.

88. At all relevant times alleged herein, Defendant was both a named fiduciary and functional fiduciary of the Plan and was acting in its fiduciary capacity with respect to the specific issues alleged herein, including all conduct, actions, and inaction alleged herein.

89. ERISA 502(a)(2), 29 U.S.C. § 1132(a)(2), provides that "a civil action may be brought by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title."

90. ERISA 409(a), 29 U.S.C. § 1109(a), provides that:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

91. ERISA 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), obligates a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan."

92. ERISA 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), obligates a fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

93. ERISA 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), obligates a fiduciary to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III."

94. These ERISA fiduciary duties have been described repeatedly by courts as "the

highest known to the law."

95.     Under the terms of the ASA, the processing and payment of claims is a fiduciary function and Defendant acted in a fiduciary capacity when it processed and paid claims for the Plan, including the second claim.

96.     Under the terms of the ASA, in processing and paying the second claim, Defendant is obligated to follow contrary instructions from Plaintiffs, agreements with Plaintiffs, and Group Health Plan provisions that conflict with its standard practices, policies, and procedures.

97.     Plaintiffs instructed and Defendant agreed to process and pay any and all pending claims for the high claimant by the end of 2018.

98.     Under the terms of the ASA, in processing and paying the second claim, if no contrary instructions, agreements, or Group Health Plan provisions exist, Defendant is obligated to make the decision to allow or deny the claim for benefits and provide notification of that decision consistent with its standard practices, policies, and procedures.

99.     Defendant's standard practice, policy, and procedure is to process, determine, pay, and notify of a benefit determination within 30 days.

100.    Under the terms of the ASA, in processing the second claim, Defendant was obligated to make the decision to allow or deny the claim for benefits and provide notification of that decision consistent with Section 503 of ERISA.

101.    Section 503 of ERISA, 29 U.S.C. § 1133, provides that:

> In accordance with regulations of the Secretary [of the Department of Labor], every employee benefit plan shall provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such a denial, written in a manner calculated to be understood by the participant.

102.     The Department of Labor's regulations related to the claims procedure under Section 503 of ERISA require post-service health claims to be decided and notification of the benefit determination to be provided to the claimant no later than 30 days after receipt of the claim. 29 CFR § 2560.503-1(f)(2)(iii)(B).

103.     The Department of Labor's regulation related to the claims procedure under ERISA 503 provides for one extension of up to 15 days only if (i) the claims administrator determines that the extension is necessary due to matters beyond the control of the claims administrator, and (ii) the claims administrator provides notice of the circumstances requiring the extension prior to the expiration of the initial 30-day period. 29 CFR § 2560.503-1(f)(2)(iii)(B).

104.     Under the terms of the ASA, in processing the second claim, Defendant remains responsible for fulfilling all contractual obligations between the Parties during and resulting from the Plan's high claimant's receipt of covered healthcare services within the Host Blue's geographic area.

105.     At least 51 days passed between submission of the second claim to the Host Blue and payment of the second claim by Defendant.

106.     Plaintiffs reasonably relied upon Defendant to perform its fiduciary duties with respect to the processing and paying the second claim.

107.     By its conduct, actions, and inaction, Defendant breached its fiduciary duties in at least the following ways:

    a.     By failing to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

    b.     By failing to act solely in the interest of and for the exclusive purpose of

providing benefits to participants and their beneficiaries and defraying reasonable

expenses of administering the Plan;

     c.     By failing to discharge its duties or otherwise act in accordance with the

documents and instruments governing the Plan;

     d.     By not making a benefit determination with respect to the second claim

within 30 days in violation of:

     (1)     the Plan's governing documents, including the ASA;

     (2)     Defendant's standard practices, policies, and procedures; and/or

     (3)     applicable Department of Labor Regulations;

     e.     By not providing notification of its benefit determination within 30 days in

violation of:

     (1)     the Plan's governing documents, including the ASA;

     (2)     Defendant's standard practices, policies, and procedures; and/or

     (3)     applicable Department of Labor Regulations;

     f.     By not processing and paying the second claim until January 11, 2019

despite:

     (1)     Plaintiffs' instruction to Defendant to process and pay all pending

claims related to the high claimant by the end of December 2018;

     (2)     Defendant's agreement to process and pay all pending claims

related to the high claimant by the end of December 2018; and/or

     (3)     Defendant's obligation under the governing Plan documents to

have done so;

     g.     By mishandling essential Plan functions expressly delegated to it;

h.       By failing to exercise appropriate authority or control over Plan assets;

i.       By mismanaging and/or maladministering Plan assets;

j.       By causing the depletion, impairment, and/or disposal of Plan assets; and

k.       By breaching and/or otherwise violating the express and/or implied agreements, terms, conditions, promises, representations, and warranties contained in the governing Plan documents, including but not limited to the ASA.

108.     By and through its conduct, actions, and inaction alleged herein, Defendant breached its fiduciary duties under the Plan, the ASA, ERISA and its promulgating regulations, and as otherwise proscribed by law.

109.     Plaintiffs have incurred the full cost of the second claim in the amount of at least $810,470.81 due to Defendant's breach of fiduciary duty.

110.     Pursuant to ERISA 409, 29 U.S.C. § 1109, Defendant is personally liable to make good to the Plan any losses resulting from its breach of fiduciary duty.

111.     Defendant's fiduciary obligations to Plaintiffs exist regardless of any grant of discretionary authority. As such, the standard of review applicable to this claim is *de novo*.

112.     As a direct and proximate result of Defendant's breach of fiduciary duty, Plaintiffs have suffered harm and damages, and are entitled to have judgment entered in their favor and against Defendant in an amount to be determined at trial.

113.     Pursuant to ERISA 502(a)(2), 29 U.S.C. § 1132(a)(2), Plaintiffs are entitled to appropriate relief under ERISA 409, 29 U.S.C. § 1109.

114.     As a fiduciary, Defendant is also subject to such other equitable or remedial relief as this Court may deem appropriate.

## SECOND CLAIM FOR RELIEF:
## BREACH OF FIDUCIARY DUTY
## UNDER ERISA 502(a)(3), 29 U.S.C. § 1132(a)(3)

115.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs

as if set forth fully herein.

116.    At all relevant times alleged herein, Defendant was both a named fiduciary and

functional fiduciary of the Plan and was acting in its fiduciary capacity with respect to the

specific issues alleged herein, including all conduct, actions, and inaction alleged herein.

117.    ERISA 502(a)(3), 29 U.S.C. § 1132(a)(3), provides that:

> A civil action may be brought by a participant, beneficiary, or
> fiduciary (A) to enjoin any act or practice which violates any
> provision of this subchapter or the terms of the plan, or (B) to
> obtain other appropriate equitable relief (i) to redress such
> violations or (ii) to enforce any provisions of this subchapter or the
> terms of the plan.

118.    ERISA 409(a), 29 U.S.C. § 1109(a), provides that:

> Any person who is a fiduciary with respect to a plan who breaches
> any of the responsibilities, obligations, or duties imposed upon
> fiduciaries by this subchapter shall be personally liable to make
> good to such plan any losses to the plan resulting from each such
> breach, and to restore to such plan any profits of such fiduciary
> which have been made through use of assets of the plan by the
> fiduciary, and shall be subject to such other equitable or remedial
> relief as the court may deem appropriate, including removal of
> such fiduciary.

119.    ERISA 404(a)(1)(A),  29 U.S.C. § 1104(a)(1)(A), obligates a fiduciary to

"discharge his duties with respect to a plan solely in the interest of the participants and

beneficiaries and for the exclusive purpose of providing benefits to participants and their

beneficiaries and  defraying reasonable expenses of administering the plan."

120.    ERISA 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), obligates a fiduciary to act "with

the care, skill,  prudence, and diligence under the circumstances then prevailing that a prudent

man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

121.     ERISA 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), obligates a fiduciary to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III."

122.     These ERISA fiduciary duties have been described repeatedly by courts as "the highest known to the law."

123.     Under the terms of the ASA, the processing and payment of claims is a fiduciary function and Defendant acted in a fiduciary capacity when it processed and paid claims for the Plan, including the second claim.

124.     Under the terms of the ASA, in processing and paying the second claim, Defendant is obligated to follow contrary instructions from Plaintiffs, agreements with Plaintiffs, and Group Health Plan provisions that conflict with its standard practices, policies, and procedures.

125.     Plaintiffs instructed and Defendant agreed to process and pay any and all pending claims for the high claimant by the end of 2018.

126.     Under the terms of the ASA, in processing and paying the second claim, if no contrary instructions, agreements, or Group Health Plan provisions exist, Defendant is obligated to make the decision to allow or deny the claim for benefits and provide notification of that decision consistent with its standard practices, policies, and procedures.

127.     Defendant's standard practice, policy, and procedure is to process, determine, pay, and notify of a benefit determination within 30 days.

128.     Under the terms of the ASA, in processing the second claim, Defendant was

obligated to make the decision to allow or deny the claim for benefits and provide notification of that decision consistent with Section 503 of ERISA.

129.    Section 503 of ERISA, 29 U.S.C. § 1133, provides that:

> In accordance with regulations of the Secretary [of the Department of Labor], every employee benefit plan shall provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such a denial, written in a manner calculated to be understood by the participant.

130.    The Department of Labor's regulations related to the claims procedure under Section 503 of ERISA require post-service health claims to be decided and notification of the benefit determination to be provided to the claimant no later than 30 days after receipt of the claim. 29 CFR § 2560.503-1(f)(2)(iii)(B).

131.    The Department of Labor's regulation related to the claims procedure under ERISA 503 provides for one extension of up to 15 days only if (i) the claims administrator determines that the extension is necessary due to matters beyond the control of the claims administrator, and (ii) the claims administrator provides notice of the circumstances requiring the extension prior to the expiration of the initial 30-day period. 29 CFR § 2560.503-1(f)(2)(iii)(B).

132.    Under the terms of the ASA, in processing the second claim, Defendant remains responsible for fulfilling all contractual obligations between the Parties during and resulting from the Plan's high claimant's receipt of covered healthcare services within the Host Blue's geographic area.

133.    At least 51 days passed between submission of the second claim to the Host Blue and payment of the second claim by Defendant.

134.    Plaintiffs reasonably relied upon Defendant to perform its fiduciary duties with respect to the processing and paying the second claim.

135.     By its conduct, actions, and inaction, Defendant breached its fiduciary duties in at least the following ways:

     a.    By failing to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

     b.    By failing to act solely in the interest of and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan;

     c.    By failing to discharge its duties or otherwise act in accordance with the documents and instruments governing the Plan;

     d.    By not making a benefit determination with respect to the second claim within 30 days in violation of:

          (1)    the Plan's governing documents, including the ASA;

          (2)    Defendant's standard practices, policies, and procedures; and/or

          (3)    applicable Department of Labor Regulations;

     e.    By not providing notification of its benefit determination within 30 days in violation of:

          (1)    the Plan's governing documents, including the ASA;

          (2)    Defendant's standard practices, policies, and procedures; and/or

          (3)    applicable Department of Labor Regulations;

     f.    By not processing and paying the second claim until January 11, 2019 despite:

(1)     Plaintiffs' instruction to Defendant to process and pay all pending claims related to the high claimant by the end of December 2018;

(2)     Defendant's agreement to process and pay all pending claims related to the high claimant by the end of December 2018; and/or

(3)     Defendant's obligation under the governing Plan documents to have done so;

g.     By mishandling essential Plan functions expressly delegated to it;

h.     By failing to exercise appropriate authority or control over Plan assets;

i.     By mismanaging and/or maladministering Plan assets;

j.     By causing the depletion, impairment, and/or disposal of Plan assets; and

k.     By breaching and/or otherwise violating the express and/or implied agreements, terms, conditions, promises, representations, and warranties contained in the governing Plan documents, including but not limited to the ASA.

136.     By and through its conduct, actions, and inaction alleged herein, Defendant breached its fiduciary duties under the Plan, the ASA, ERISA and its promulgating regulations, and as otherwise proscribed by law.

137.     Plaintiffs have incurred the full cost of the second claim in the amount of at least $810,470.81 due to Defendant's breach of fiduciary duty.

138.     Defendant's fiduciary obligations to Plaintiffs exist regardless of any grant of discretionary authority. As such, the standard of review applicable to this claim is *de novo*.

139.     As a direct and proximate result of Defendant's breach of fiduciary duty, Plaintiffs have suffered harm and damages, and are entitled to have judgment entered in their favor and against Defendant in an amount to be determined at trial.

140. Pursuant to ERISA 502(a)(3), 29 U.S.C. § 1132(a)(3), this Court should award appropriate equitable relief to redress Defendant's violations of ERISA and the Plan and to enforce the provisions of ERISA and the Plan.

141. As a fiduciary, Defendant is also subject to such other equitable or remedial relief as this Court may deem appropriate.

**WHEREFORE**, Plaintiffs pray the Court:

1. Declare that Defendant has violated the duties, responsibilities, and obligations imposed upon it as a fiduciary under ERISA;

2. Compel Defendant to make good to the Plan all losses to the Plan resulting from Defendant's breach of fiduciary duty;

3. Award declaratory and injunctive relief, finding that Plaintiffs are entitled to recover from Defendant the actual damages and all other losses incurred as a result of Defendant's breach of fiduciary duty;

4. Award monetary damages in an amount to be proven at trial;

5. Grant Plaintiffs appropriate equitable relief against Defendant, as permitted by law, equity, and the federal statutory provisions set forth herein, including but not limited to restitution, surcharge, equitable estoppel, and/or other appropriate remedial relief;

6. Award Plaintiffs prejudgment interest of at least the North Carolina legal rate of 8%;

7. Award Plaintiffs all reasonable attorneys' fees and expenses incurred as a result of Defendant's actions alleged herein; and

8. Award such other and further relief as this Court may deem just and proper.

This the 14th day of June, 2019.

/s/Norris A. Adams, II
NORRIS A. ADAMS, II
N.C. State Bar No. 32552
nadams@essexrichards.com
**ESSEX RICHARDS, P.A.**
1701 South Boulevard
Charlotte, North Carolina 28203
Phone: (704) 377-4300
Facsimile: (704) 372-1357
*Attorney for Plaintiffs*